SOUTHWICK, J.,
for the Court.
¶ 1. This suit concerns the lease of about 400 acres of land for agricultural purposes, a sublease of the same land, and the reach of the landowner’s statutory lien on crops. The trial court voided the crop lien because the owner sought payment of the rent owed her out of the proceeds from the subtenant’s crops but did not join her own tenant in the suit. We agree that the plaintiff should not have sought payment from the subtenant as surety on the debt without first seeking payment from the principal debtor. The remedy for that procedural defect is not necessarily to void the agricultural lien, as voiding is proper only if the rights of the surety have been impaired. We reverse and remand for further proceedings consistent with this opinion.
FACTS
¶ 2. The plaintiff landowner is Jean T. McClatchey. From 1994 until 2000, she entered annual farming leases on the 400 acres involved in this litigation with her nephew, Charles T. (Toby) McClatchey. In 1999 the nephew stopped farming. Thereafter, farming operations were conducted by his wife, Jean W. McClatchey, under the business name of Waltonia Farms. There is evidence that the landowner Jean T. McClatchey did not know *458 that her nephew’s wife had become the operator of the lease. At the time that the nephew Toby McClatchey stopped farming, he was under a criminal investigation by federal authorities. In April 2000, he was sentenced to federal prison. In 2001, he declared bankruptcy. In 2003, his wife Jean W. McClatchey did the same.
¶ 3. The final Waltonia Farms lease on the 400 acres was for the 2001 crop year. The financial and criminal challenges facing the McClatchey nephew and his wife were the background for Waltonia Farms’ subleasing the 400 acres to Anthony Farms. The latter company is a partnership. On April 24, 2001, Anthony Farms received a sublease from Waltonia Farms covering the subject 400 acres of farm land and other property not involved in the crop lien issues before us. The owner of the 400 acres, Jean T. McClatchey, signed an agreement for the sublease. She did not, however, enter any contractual relationship with the sublessee Anthony.
¶ 4. Anthony Farms paid Waltonia Farms the full lease amount of $43,232 on the day the sublease was executed, which was April 24, 2001. Also on that day, Waltonia Farms, through Jean W. McClat-chey, paid $10,000 to its lessor and the landowner Jean T. McClatchey. On October 1, 2001, Jean T. McClatchey filed a lien on the 400 acres, stating in the filing that based on information and belief, Wal-tonia Farms had sublet the land to Anthony Farms. She alleged that the rent due her for the 2001 crop season was delinquent. Waltonia Farms had paid her $25,000 in 2001, but there is evidence that Toby McClatchey had not been timely in his payments of rent in previous crop years. Jean T. McClatchey allocated the 2001 payments to past due amounts from previous years. Because of this allocation, it was alleged that the entire rent of $22,500 for 2001 remained outstanding. Since neither her nephew nor the nephew’s wife was thought to be financially able to make the lease payments, she filed the crop lien against Anthony Farms, to facilitate recovering the $22,500.
¶ 5. Anthony Farms brought suit to cancel the crop lien on November 14, 2001. On October 7, 2003, the parties entered into a stipulation in which they agreed to most of the facts of the case. The stipulation also identified the payments on the annual leases that the landowner had received from her nephew or Waltonia from 1994-2001. The stipulation revealed that the nephew often did not make timely payments. When he did not pay, a ten percent interest rate was applied to the rent. Late payments plus interest were made for rent due in 1997, 1998, 1999, and 2000. The landowner Jean T. McClatchey asserted she always applied outstanding payments first to rent due and its accrued interest before applying payment to more recent leases.
¶ 6. Two weeks after entering into the stipulation, the landowner Jean T. McClat-chey filed a counterclaim against Anthony Farms. She alleged that Anthony as sub-lessee was a surety for the outstanding rent due from the tenant, Waltonia Farms. It was also alleged that because of the bankruptcies filed by her nephew and his wife, there were “no assets from which to pay unsecured creditors” such as herself.
¶ 7. A trial was held on January 26, 2005. In the chancellor’s written opinion of February 18, 2005, the statutory lien that landowners have on crops grown on their property was voided because the landowner had failed first to seek the rent from her immediate lessees, either Charles (Toby) McClatchey or Waltonia Farms under the management of Jean W. McClat-chey.
¶ 8. From this decision Jean T. McClat-chey has appealed.
*459 DISCUSSION
¶ 9. The chancellor and the sublessee Anthony Farms agree that this suit fails because the landowner did not initially try to recover her rent from her nephew or the nephew’s wife. Under that analysis, not only were those individuals and Walto-nia Farms primarily liable, the failure to seek recovery from them has voided the statutory crop hen. On the other side of the dispute, the landowner alleges that bringing suit against the bankrupt relatives would have been futile. Moreover, since after filing notice of her statutory lien she became the defendant in litigation commenced by the sublessee, she was hardly the initiator of any action with Anthony.
¶ 10. We find one statute, a few precedents, and some basic principles about sureties to resolve the central issues in this case. We start with the statute that gives landowners a lien on crops grown by anyone on their property:
(1) Every lessor of land shall have a lien on the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent and of money advanced to the tenant, and the fair market value of all advances made by him to his tenant for supplies for the tenant and others for whom he may contract, and for his business carried on upon the leased premises. This lien shall be paramount to all other liens, claims, or demands upon such products tuhen perfected in accordance ivith Uniform Commercial Code Article 9 — Secured Transactions (Section 75-9-101, et seq.). The claim of the lessor for supplies furnished may be enforced in the same manner and under the same circumstances as his claim for rent may be; and all the provisions of law as to attachment for rent and proceedings under it shall be applicable to a claim for supplies furnished, and such attachment may be levied on any goods and chattels liable for rent as well as on the agricultural products.
Miss.Code Ann. § 89-7-51 (Supp.2005) (emphasis added). The clause that we italicized was effective on January 1, 2002. 2001 Miss. Laws. Ch. 495, § 34. The notice of lien in the present case was filed before the UCC language was effective.
¶ 11. The lien notice signed and filed by the landowner, Jean W. McClatchey, stated this:
NOTICE OF LIEN ON CROPS
Pursuant to § 89-7-51 of the Mississippi Code of 1972, as amended, and related statutes, notice is hereby given that JEAN T. McCLATCHY, as landlord and lessor, does hereby claim a lien on all crops grown on the property which she has leased to C.H. McCLATCHY, JR., and/or JEAN W. McCLATCHY and or WALTONIA FARMS, the tenant, described upon Exhibit “A” attached hereto [the 400 acres] in Sunflower County, Mississippi, for unpaid rent for 2001 for a total rental of $22,500.00.
On information and belief, the property described upon Exhibits “A” was subleased to Roger Anthony and/or Anthony Farms.
Dated this the 1st day of October, 2001.
¶ 12. There has been no argument on appeal that the landowner’s notice failed to comply with the statute as it existed at the time of filing the notice. We accept, then, that whatever lien a proper notice would give Jean T. McClatchey was possessed after this document was filed.
¶ 13. The parties argue over the few precedents addressing the operation of the crop lien. Both parties are using the same legal materials and disagree as to *460 what the caselaw is holding. As we -will discuss, it is clear from the precedents that the crops of a sublessee or subtenant are only secondarily liable for whatever debt is owed the landowner by her tenant. The differences in interpretation arise from whether the landowner did what was required before pursuing collection from the subtenant. Further, if there are still avenues to pursue against her nephew and the nephew’s wife, it is disputed whether the landowner’s prematurely seeking recovery from the subtenant voids her crop lien.
¶ 14. Landowners upon giving proper notice obtain liens on crops grown on their land whether raised by their tenants or by someone else. Dale v. Webb, 166 Miss. 309, 146 So. 875 (1933). It is undisputed that Jean T. McClatchey had leased her land to Waltonia Farms prior to the sublease by Waltonia Farms to Anthony Farms, and that some amount of the rent for prior years had not been paid. Anthony on appeal agrees with the chancellor’s conclusion that seeking recovery from the subtenant before pursuing collection from the tenant voids the lien as to the crops the subtenant has grown, citing but interpreting differently the same precedents as are relied upon by Jean T. McClatchey. E.g., Hooks v. Burns, 168 Miss. 723, 152 So. 469 (1934); Dale v. Webb, 146 So. at 876; Powell v. Tomlinson, 129 Miss. 354, 92 So. 226 (1922).
¶ 15. We review two precedents to establish the basics of the legal principles that are involved. In what may be the foundational ease for interpreting subtenants’ obligations under this lien — a lien which appears to have been adopted initially as Section 1301 of the 1880 Mississippi Code- — the Supreme Court held that a subtenant is a surety for the obligation of the original tenants to the landowner. Applewhite v. Nelms, 71 Miss. 482, 14 So. 443, 443-44 (1894). The landowner in that suit had leased property to two tenants jointly, who then partitioned the property between them. One tenant subleased his parcel. The other farmed his land and sold part of his crop. The landowner brought suit for his rent against everyone including the subtenant and the purchasers of part of the crop. The landlord alleged in his complaint that the tenants, subtenant and purchaser of part of the crop had colluded to avoid the statutory liability, that the initial tenants were insolvent, and that the subtenants and others should account for the rent. Id., 14 So. at 443.
¶ 16. The court reversed the dismissal of the suit and remanded, noting that all the parties necessary for complete relief were in the litigation. In summary, the instructions given for the remand were that as much of the payment as possible was to be obtained from the original tenants. Only the shortfall would be obtainable from the proceeds of the crops of the subtenants, whether the crops were still possessed by them or instead by their purchasers or assigns. Id., 14 So. at 444.
¶ 17. This first judicial interpretation of the reach of a landowner’s crop lien to subtenants made it clear that the crops grown on the property by subtenants were liable for the rent due the landowner once the ability of the original tenant to pay that rent was exhausted.
¶ 18. Applewhite was a suit that was brought by the landowner against all subsequent owners of interests in the land or crops. Therefore, our issue of the effect of the landowner’s skipping over her tenants and proceeding directly against subtenants did not arise. Another precedent contains the relevant procedural hurdling. Powell v. Tomlinson, 129 Miss. 354, 92 So. 226 (1922). Powell leased his land to a tenant, who in turn subleased part to a man named Crane. Crane paid rent to his *461 lessor from the proceeds of the crops and delivered the remainder of the crop to a man named Tomlinson, who provided “the means with which to make a crop on the land sublet to him.... ” As security for payment, the landowner Powell held a deed of trust that his tenant had executed on some stock, and also a deed of trust on crops that the tenant was to raise the following year. The tenant paid all his debts to the landowner Powell except for a small amount. The landlord attempted to recover the amount still owed him by his tenant by suing only the supplier Tomlin-son, who had received part of the subtenant’s crop to satisfy the debt between those two. Id., 92 So. at 227.
¶ 19. On appeal, the court found that the subtenant Crane was a surety for the indebtedness owed by his lessor (the original tenant) to the landowner Powell. However, the surety was entitled to have the creditor seek recovery from the person primarily liable and not “throw away an opportunity to collect his debt” by means other than proceeding against the surety. Id. The court found that the landowner had entirely ignored the security of the deeds of trust on crops and stock. “Under the law where the principal debtor and the creditor make a material change in the contract evidencing the indebtedness,” this releases the surety in the absence of consent to the change. Id. at 228. The Poiv-ell court does not state what the original tenant and the landowner did that was a material change. The statement just quoted followed immediately after the court noted that the tenant had given deeds of trust on crops on the land that was not subleased and on stock. There is also in the opinion an almost contemporaneous reference to what the landowner did, which was to bring suit against the subtenant and not against the tenant.
¶ 20. However we should interpret the specific facts of these and the other precedents, we conclude that the legal principle at issue is a familiar one and can be stated more generally than in the agricultural lien context. The controlling prohibition is that a creditor cannot increase the secondarily liable entity’s risk by actions that release the primarily responsible entity in whole or in part. A good explanation of this concept is in the Re statement of Suretyship and Guaranty:
(1) If the obligee acts to increase the secondary obligor’s risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, the secondary obli-gor is discharged as described in subsections (2) and (3).... An act that increases the secondary obligor’s risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an “impairment of suretyship status.”
(2) If the obligee fundamentally alters the risks imposed on the secondary obli-gor by:
[[Image here]]
(b) agreeing to a modification of the duties of the principal obligor that either amounts to a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed on the secondary obligor prior to modification;
the secondary obligor is discharged from any unperformed portion of the secondary obligation as more fully set forth in those sections.
(3) If the obligee impairs the secondary obligor’s recourse against the principal obligor by:
[[Image here]]
*462 (e) failing to institute an action before expiration of the statute of limitations governing the underlying obligation; or
(f) any other act or omission that impairs the principal obligor’s duty of performance, the principal obligor’s duty to reimburse, or the secondary obligor’s right of restitution or subrogation;
the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent set forth in those sections in order to prevent the impairment of recourse from causing the secondary obligor a loss.
Restatement (Third) of Suretyship & GUARANTY § 37 (2006).
¶21. This litigation was resolved below based simply on the fact that the landowner Jean T. McClatchey, after being sued for cancellation of the lien notice that she had filed, brought a counterclaim against Anthony without joining her own nephew, his wife, and perhaps their business entity Waltonia Farms. There is substantial evidence that those who are primarily liable to Jean T. McClatchey are bankrupt. We do not find that the chancellor considered the issues raised by surety law and the need to prove that the surety’s risk has been increased due to actions by the creditor. We reject that the mere bringing of a counterclaim against the surety without joining the landowner’s tenants as defendants acts as an automatic cancellation of the obligations of a surety.
¶ 22. Instead, before this suit can be dismissed because of impairment of the rights of the surety, there must be proof that those rights have actually been impaired. It is when “the principal debtor and the creditor make a material change in the contract evidencing the indebtedness,” that the surety is released. Powell, 92 So. at 228. Resort must first be made by a creditor to the primarily liable party. Merely getting ahead of oneself, as Jean T. McClatchey did in bringing suit against the surety first, is not necessarily a material change.
¶ 23. We are not holding that if the agricultural lien remains effective, that any amount is owed by Anthony. Anthony Farms apparently paid Waltonia in full on the sublease; some of the rent money was then paid to Jean T. McClatchey. The effect of those and other facts would need to be considered. We only conclude that the chancellor erred in ruling that the lien had been lost solely because a counterclaim was brought against Anthony alone and without joinder of the nephew and his wife. We reverse and remand on the issue of whether the agricultural lien has been forfeited.
¶ 24. The record is clear that Jean T. McClatchey did nothing to attempt to collect her rent from Waltonia Farms, her nephew or the nephew’s wife. She admitted she did not want to sue Waltonia Farms because that would involve suing her family. On remand, the chancellor should determine whether there has been a failure to join necessary parties or whether joinder would be futile. If the resolution of procedural issues allows the case to proceed, evidence can be taken on whether the surety’s rights were impaired sufficiently to justify voiding the lien because of Jean T. McClatchey’s failure to pursue a claim against the two other McClatchey family members and Waltonia Farms. If the lien remains in effect, the determination then must be made of what, if anything, is owed by the subtenant Anthony Farms to the landowner.
¶ 25. THE JUDGMENT OF THE CHANCERY COURT OF SUNFLOWER COUNTY IS REVERSED AND THE CAUSE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS *463 OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.